IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No.

UNITED STATES OF AMERICA, and
STATE OF NORTH DAKOTA,

      Plaintiffs,

  v.

BELLE FOURCHE PIPELINE COMPANY,

      Defendant.

---

## COMPLAINT

---

The United States of America ("United States"), by the authority of the Attorney General of the United States, and on behalf of the United States Environmental Protection Agency ("EPA") and the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration ("PHMSA"); and the State of North Dakota (the "State"), on behalf of the North Dakota Department of Environmental Quality ("NDDEQ"), file this complaint and allege as follows:

### NATURE OF ACTION

1.      This is a civil action against Belle Fourche Pipeline Company ("Belle Fourche" or "Defendant").

2.      Defendant owns and operates hundreds of miles of buried pipelines that gather and transport crude oil in North Dakota, Montana, and Wyoming.

3.      In late 2016, one of those pipelines ruptured in Billings County, North Dakota, approximately 20 miles northwest of the city of Belfield, resulting in the discharge of approximately 14,400 barrels of crude oil, including into an unnamed tributary to Ash Coulee Creek, Ash Coulee Creek itself, the Little Missouri River, and their adjoining shorelines (the "Ash Coulee Spill"), in violation of the Clean Water Act ("CWA"), regulations promulgated pursuant to the Pipeline Safety Act ("PSA") (referred to herein as the "Federal Pipeline Safety Regulations"), and North Dakota state law.

4.      The United States seeks injunctive relief, civil penalties, and punitive damages for Defendant's violations of the Clean Water Act and the Federal Pipeline Safety Regulations pursuant to, respectively, Sections 309 and 311 of the CWA, 33 U.S.C. §§ 1319 and 1321, and Section 60120 of the PSA, 49 U.S.C. § 60120.

5.      The State seeks injunctive relief and civil penalties for violations of North Dakota law pursuant to N.D. Cent. Code §§ 61-28-04(22), 61-28-08, 23-29-04(8), 23-29-11, and 23-29-12. The State also seeks recovery of its costs relating to the Ash Coulee Spill pursuant to N.D. Cent. Code §§ 23-31-01 (recodified as 23.1-10-01 in 2019 and then repealed in 2021, 2021 N.D. Sess. Laws, ch. 212, § 19) and 23.1-10-12 (effective 2021).

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 309(b), 311(b)(7)(E), and 311(n) of the CWA, 33 U.S.C. §§ 1319(b), 1321(b)(7)(E), and 1321(n); Section 60120(a)(1) of the PSA, 49 U.S.C. § 60120(a)(1); and 28 U.S.C. §§ 1331, 1345, and 1355.

7.      This Court has supplemental jurisdiction over the claims asserted by the State pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this District pursuant to Sections 309(b) and 311(b)(7)(E) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E); Section 60120(a)(1) of the PSA, 49 U.S.C. § 60120(a)(1); and 28 U.S.C. §§ 1391 and 1395, because the violations that are the subject of this action occurred in this District, and Defendant is located and does business in this District.

9.      Authority to bring the United States' claims is vested in the United States Department of Justice by Section 506 of the CWA, 33 U.S.C. § 1366; Section 60120 of the PSA, 49 U.S.C. § 60120; and 28 U.S.C. §§ 516 and 519.

10.     Authority to bring the State's claims is vested in NDDEQ by N.D. Cent. Code §§ 61-28-04, 61-28-08, 23-29-04(8), 23-29-11, and 23-29-12. NDDEQ was established on April 29, 2019, and became the State agency responsible for the administration and enforcement of the environmental protection programs, laws, and rules previously administered and enforced by the North Dakota Department of Health's Environmental Health Section. Pursuant to 2017 N.D. Laws ch. 199, § 1, the North Dakota Department of Health's interest in the causes of action alleged in the Complaint were assigned to NDDEQ. For purpose of the Complaint, the term "NDDEQ" includes the North Dakota Department of Health for activities occurring prior to April 29, 2019, and for statutes and rules in effect prior to April 29, 2019. Due to the transition, the statutes in N.D. Cent. Code ch. 23-29 have moved to N.D. Cent. Code ch. 23.1-08, and the rules in N.D. Admin. Code arts. 33-16 and 33-20 have moved to 33.1-16 and 33.1-20. Because the violations began prior to April 29, 2019, NDDEQ references N.D. Cent. Code ch. 23-29 and N.D. Admin. Code arts. 33-16 and 33-20 in this Complaint, but for activities ongoing after the transition, NDDEQ also alleges violations of the nearly identical statutes in N.D. Cent. Code ch. 23.1-08 and rules in N.D. Admin. Code arts. 33.1-16 and 33.1-20.

## DEFENDANT

11.     Belle Fourche is a Wyoming corporation.

12.     Belle Fourche owns and operates the Bicentennial Pipeline, which includes a segment that gathers and transports crude oil between the Skunk Hill pump station in Billings County, North Dakota and the Bicentennial pump station in McKenzie County, North Dakota (the "Skunk Hill to Bicentennial Segment").

13.     Belle Fourche is a "person" within the meaning of Sections 311(a)(7) and 502(5) of the CWA, 33 U.S.C. §§ 1321(a)(7) and 1362(5); Section 60101(a)(17) of the PSA, 49 U.S.C. § 60101(a)(17); and N.D. Cent. Code §§ 61-28-02(5) and 23-29-03(11).

## FEDERAL STATUTORY AND REGULATORY REQUIREMENTS

### Clean Water Act

14.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant, including oil, by any person, except as authorized by and in compliance with other sections of the Act. 33 U.S.C. § 1311(a).

15.     The Clean Water Act authorizes the United States to "commence a civil action for appropriate relief, including a permanent or temporary injunction," for violations of Section 301 of the Act. 33 U.S.C. § 1319(b).

16.     Another section of the Clean Water Act, Section 311(b)(3), prohibits the discharge of oil into or upon the navigable waters of the United States and adjoining shorelines in such quantities as the President determines may be harmful to the public health or welfare or environment of the United States. 33 U.S.C. § 1321(b)(3).

17.     The President, through a delegation to EPA, has determined that quantities of oil that may be harmful, for purposes of Section 311, include discharges that (a) violate applicable

-4-

water quality standards or (b) cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines. 40 C.F.R. § 110.3.

18.     Anyone violating Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), is subject to a civil penalty. The penalty for a spill in December 2016 (when the Ash Coulee Spill began) is up to $6,215 per barrel of oil discharged where the violation was the result of gross negligence or willful misconduct, and up to $2,072 per barrel in other cases. 33 U.S.C. § 1321(b)(7)(A) and (D); 40 C.F.R. § 19.4.

### Federal Pipeline Safety Regulations

19.     Pursuant to Section 60102(a) of the PSA, PHMSA has promulgated regulations prescribing, among other things, minimum safety standards for pipeline operation and maintenance. 49 U.S.C. § 60102(a).

20.     As relevant here, these regulations are codified at 49 C.F.R. Part 195 (the "Federal Pipeline Safety Regulations").

21.     The Federal Pipeline Safety Regulations contain requirements that apply to operators of hazardous liquid pipelines that could affect a "high consequence area." 49 C.F.R. § 195.452.

22.     The Federal Pipeline Safety Regulations define "high consequence area" ("HCA") to include an "unusually sensitive area." 49 C.F.R. § 195.450. An unusually sensitive area, in turn, is defined as "a drinking water or ecological resource area that is unusually sensitive to environmental damage from a hazardous liquid pipeline release." 49 C.F.R. § 195.6.

23.     The Federal Pipeline Safety Regulations define drinking water and ecological resources, for purposes of identifying unusually sensitive areas. A drinking water resource is defined to include the water intake for a "community water system" and the "source water protection area" for a community water system. 49 C.F.R. § 195.6(a). An ecological resource is

defined to include an area containing a critically-imperiled species or an imperiled, threatened, or endangered species that is aquatic, aquatic dependent, or terrestrial with a limited range. 49 C.F.R. § 195.6(b)(1) and (4).

24.     The Federal Pipeline Safety Regulations require operators of pipelines that could affect a "high consequence area" to develop and implement a written integrity management program ("IMP"). 49 C.F.R. § 195.452(b).

25.     This IMP must assess and address the risks to the integrity of each segment of pipeline, following "recognized industry practices," unless otherwise specified in 49 C.F.R. § 195.452 or the "operator demonstrates that an alternative practice is supported by a reliable engineering evaluation and provides an equivalent level of public safety and environmental protection." 49 C.F.R. § 195.452(b).

26.     In assessing the risks to the integrity of each pipeline segment, the operator must consider, among other things, "[l]ocal environmental factors that could affect the pipeline," such as subsidence (i.e. the gradual caving in or sinking of an area of land), "geo-technical hazards," and "[p]otential natural forces inherent in the area (flood zones, earthquakes, subsidence areas, etc.)." 49 C.F.R. § 195.452(e) and 49 C.F.R. Part 195, Appendix C § I.B(12).

27.     An operator "must continually change the [IMP] to reflect operating experience, conclusions drawn from results of the integrity assessments, and other maintenance and surveillance data." 49 C.F.R. § 195.452(f). The IMP must include, among other things, a "continual process of assessment and evaluation to maintain a pipeline's integrity," "[i]dentification of preventative and mitigative measures to protect the high consequence area," and a "process for review of integrity assessment results and information analysis by a person qualified to evaluate the results and information." 49 C.F.R. § 195.452(f)(5), (6), and (8).

28.     The operator must also "take measures to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area," including "conducting a risk analysis of the pipeline segment to identify additional actions to enhance public safety or environmental protection." 49 C.F.R. § 195.452(i)(1).

29.     The Federal Pipeline Safety Regulations require operators to have a means to detect leaks on their pipeline systems. 49 C.F.R. § 195.452(i)(3). The operator "must evaluate the capability of its leak detection means and modify, as necessary, to protect the high consequence area." Id.

30.     The United States may bring an action to enforce the Federal Pipeline Safety Regulations. 49 U.S.C. § 60120(a)(1). In such an action, the Court may award appropriate relief, including a temporary or permanent injunction, punitive damages, and civil penalties. Id.

## STATE STATUTORY AND REGULATORY REQUIREMENTS

### Permit Required for Discharges

31.     North Dakota Century Code § 61-28-06(2)-(3) makes it unlawful for a person to discharge any wastes, except in compliance with a valid permit issued by NDDEQ.

32.     North Dakota Administrative Code § 33-16-01-02 provides that a person must file a NPDES permit application before discharging "any waste through a point source into a surface water." A NPDES permit issued by NDDEQ is referred to as a North Dakota pollutant discharge elimination system ("NDPDES") permit.

### Pollution and Degradation of Water Quality Prohibited

33.     North Dakota Century Code § 61-28-06(1)(a) makes it unlawful for a person "[t]o cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any waters of the state."

-7-

34.    North Dakota Century Code § 61-28-06(1)(b) makes it unlawful for a person "[t]o discharge any wastes into any waters of the state or to otherwise cause pollution, which reduces the quality of such waters below the water quality standards established therefor by the department."

35.    North Dakota Administrative Code § 33-16-02.1-11(2) makes it unlawful to discharge into the waters of the state "untreated industrial wastes or other wastes which contain substances . . . which may endanger public health or degrade the water quality of water usage."

36.    North Dakota Administrative Code § 33-16-02.1-09 provides for the classification of the state's surface water and contains the standards with which the various classifications of surface water must comply, including physical and chemical criteria. "[S]treams are classified as the class of water quality which is to be maintained in the specified stream." Appendix I, N.D. Admin. Code ch. 33-16-02.1. At all relevant times, the numeric maximum benzene standard for Class III streams was 51 μg/l. N.D. Admin. Code § 33-16-02.1-09(3) (2014).

37.    North Dakota Administrative Code § 33-16-02.1-08(1) contains the state's narrative water quality standards, which, as relevant here:

   a.    Require that all waters of the state be free from floating oil or scum attributable to industrial or other discharges in amounts that are "unsightly or deleterious"; substances attributable to industrial or other discharges that are in concentrations or combinations "toxic or harmful to humans, animals, plants, or resident aquatic biota"; and "oil or grease residue attributable to wastewater, which causes a visible film or sheen upon the waters or any discoloration of the surface of adjoining shoreline or causes a sludge or emulsion to be deposited beneath the surface of the water or upon the adjoining shorelines or prevents classified uses of such waters."  N.D. Admin. Code § 33-16-02.1-08(1)(a).

b. Prohibit the discharge of pollutants, which "[c]ause a public health hazard or injury to environmental resources; [i]mpair existing or reasonable beneficial uses of the receiving waters; or [d]irectly or indirectly cause concentrations of pollutants to exceed applicable standards of the receiving waters." N.D. Admin. Code § 33-16-02.1-08(1)(e).

**Spill Reporting Required**

38. North Dakota Administrative Code § 33-16-02.1-11(4) provides that "[a]ny spill or discharge of waste which causes or is likely to cause pollution of waters of the state must be reported immediately." The owner, operator, or person responsible must "provide all relevant information about the spill." Id. NDDEQ then has the authority to require the owner or operator to take actions necessary to comply with N.D. Admin. Code ch. 33-16-02.1, including taking immediate remedial measures and determining the extent of the pollution. Id.

**Unpermitted Disposal and Abandonment of Solid Waste Prohibited**

39. North Dakota Century Code § 23-29-07 and North Dakota Administrative Code § 33-20-02.1-01 makes it unlawful to own, operate, or use an unpermitted facility for solid waste disposal.

40. North Dakota Administrative Code § 33-20-01.1-04(1) provides "[a]ny person who owns or operates any premises, business establishment, or industry is responsible for the solid waste management activities, such as storage, transportation, resource recovery, or disposal of solid waste generated or managed at that person's premises, business establishment, or industry."

41. North Dakota Administrative Code § 33-20-01.1-04(2) provides "[n]o solid waste may be delivered to a facility which is not in compliance with this article or abandoned upon any . . . private premises."

**Penalty**

42.     North Dakota Century Code § 61-28-08(4) provides that a person who violates

N.D. Cent. Code ch. 61-28 or a "rule, order, limitation, or other applicable requirement

implementing this chapter, is subject to a civil penalty not to exceed twelve thousand five

hundred dollars per day per violation."

43.     North Dakota Century Code § 23-29-12(1) provides that "[a]ny person who

violates this chapter or any permit condition, rule, order, limitation, or other applicable

requirement implementing this chapter is subject to a civil penalty not to exceed twelve thousand

five hundred dollars per day per violation . . . ."

**Injunctive Relief**

44.     North Dakota Century Code § 61-28-08(5) authorizes NDDEQ to "maintain an

action in the name of the state against any person to enjoin any threatened or continuing violation

of any provision of this chapter or any permit condition, rule, order, limitation, or other

applicable requirement implementing this chapter."

45.     North Dakota Century Code § 23-29-11 authorizes NDDEQ to maintain an action

in the name of the state against any person to enjoin actions or practices that "constitute or will

constitute a violation of this chapter, or any rule, regulation, or order" or for an order directing

compliance.

**Cost Recovery**

46.     North Dakota Century Code § 23-31-01, which was recodified as 23.1-10-01 in

2019, authorizes NDDEQ to "recover from the parties responsible for an environmental

emergency the reasonable and necessary state costs incurred in assessment, removal, corrective

action, or monitoring as a result of an environmental emergency in violation of chapter [23-29 or 61-28]."

47.    An "environmental emergency" is "a release into the environment of a substance requiring an immediate response to protect public health or welfare or the environment from an imminent and substantial endangerment and which is in violation of chapter [23-29 or 61-28]." N.D. Cent. Code § 23-31-01.

48.    "Reasonable and necessary costs" are "those costs incurred by [NDDEQ] as a result of the failure of the parties responsible for the environmental emergency to implement appropriate assessment and corrective action after receipt of written notice from [NDDEQ]." N.D. Cent. Code § 23-31-01.

49.    Additionally, North Dakota Century Code Chapter 23.1-10, which went into effect on July 1, 2021, but is retroactive in application (2021 N.D. Sess. Laws, ch. 212, § 20), prohibits releases of regulated substances and authorizes NDDEQ to respond to such releases by conducting and overseeing "environmental assessment, removal, corrective action, or monitoring." N.D. Cent. Code §§ 23.1-10-02 and 23.1-10-06.

50.    North Dakota Century Code § 23.1-10-12 authorizes NDDEQ to "recover its reasonable and necessary expenses incurred under this chapter, including all corrective action costs and administrative and legal expenses, in a civil action brought against a responsible party." NDDEQ's "certification of expenses is prima facie evidence the expenses are reasonable and necessary." N.D. Cent. Code § 23.1-10-12. NDDEQ must "provide written notice to a responsible party before incurring costs, except when prior notice is not possible because the identity of the responsible party is unknown or situations require emergency remedial efforts." Id.

## GENERAL ALLEGATIONS

### Bicentennial Pipeline/Ash Coulee Spill

51.     The Bicentennial Pipeline runs from Dickinson, North Dakota to the Bicentennial pump station in McKenzie County, North Dakota.

52.     The segment of the Bicentennial Pipeline between the Skunk Hill pump station and the Bicentennial pump station (referred to herein as the "Skunk Hill to Bicentennial Segment") is six inches in diameter and approximately 58 miles long. It transports crude oil from the Skunk Hill station to the Bicentennial station.

53.     The Skunk Hill to Bicentennial Segment passes through Little Missouri National Grassland, the largest grassland in the country.

54.     The Skunk Hill to Bicentennial Segment crosses under both Ash Coulee Creek and the Little Missouri River.

55.     Ash Coulee Creek is a tributary to the Little Missouri River.

56.     The Little Missouri River is a tributary to the Missouri River.

57.     According to Belle Fourche, at the time of the Ash Coulee Spill, the average flow on the Skunk Hill to Bicentennial Segment was approximately 1,000 barrels per hour (24,000 barrels per day).

58.     At all relevant times, the Skunk Hill to Bicentennial Segment could affect a High Consequence Area, as that term is defined in 49 C.F.R. § 195.450.

59.     At the time of the Ash Coulee Spill, the Skunk Hill to Bicentennial Segment was included in the written Integrity Management Plan developed by Belle Fourche to comply with 49 C.F.R. § 195.452.

60.     The National Pipeline Mapping System ("NPMS") identifies pipelines regulated by PHMSA, along with certain other information, such as the locations of High Consequence Areas. At all relevant times, the NPMS identified portions of the Little Missouri National Grassland as a High Consequence Area.

**Failure to Adequately Address Known Risk of Slope Failure**

61.     The Skunk Hill to Bicentennial Segment passes through hilly, unstable terrain, which is prone to failure and other mass movements.

62.     On or about December 1, 2016, the Bicentennial Pipeline ruptured approximately 17.4 pipeline miles west of the Skunk Hill station, in Billings County, North Dakota (the "Site").

63.     Prior to the Ash Coulee Spill, there were visible signs that the hillside at the Site was unstable and failing.

64.     Prior to the Ash Coulee Spill, Belle Fourche was aware of the risk of unstable soils, slope failure, and other mass movements at the Site.

65.     In fact, there was a landslide, slope failure, or other mass movement at the Site in or before 2012, which did not cause the pipeline to rupture.

66.     Following this landslide, slope failure, or other mass movement, Belle Fourche, in 2013, replaced a section of pipeline at the Site using the HDD method.

67.     Belle Fourche failed, however, to obtain geotechnical data specific to the Site (e.g. soil borings) and use that data to adequately address the risk of unstable soils, slope failure, and other mass movements.

68.     Belle Fourche failed to conduct an adequate risk analysis, prior to the Ash Coulee Spill, that properly considered the risk of unstable soils, slope failure, and other mass movement at the Site.

69.     As a result of this failure, Belle Fourche failed to identify and take additional actions – such as rerouting the pipeline – to prevent and mitigate the consequences of slope failure and other mass movement at the Site that could expose the pipeline to excessive external loads.

**Failure to Correct Mis-Calibrated Flow Meter at Bicentennial Station**

70.     At the time of the Ash Coulee Spill, Belle Fourche used volume balancing to detect leaks on the Skunk Hill to Bicentennial Segment.

71.     The volume balancing method involves comparing the incoming (or receipt) and outgoing (or delivery) volumes, based on flow meter data. A discrepancy or "short" between the incoming and outgoing volumes would indicate a leak.

72.     The volume balancing method was dependent on the accuracy of flow meters at the Skunk Hill and Bicentennial stations.

73.     At the time of the Ash Coulee Spill, flow rate data from the Skunk Hill and Bicentennial meters was transmitted in real time, via a supervisory control and data acquisition ("SCADA") system, to Defendant's control room in Casper, Wyoming.

74.     At the time of the Ash Coulee Spill, the flow meter at the Bicentennial station was mis-calibrated.

75.     The mis-calibration of the Bicentennial meter was the result of two separate blunders by Belle Fourche.

76.     First, Belle Fourche performed an improper "zero calibration." A zero calibration resets the meter to read the conditions at the time of the zero calibration as zero flow. Thus, a proper zero calibration would only be done when there is no actual flow. Belle Fourche did a zero calibration when there was flow through the meter. As a result of the improper zero

calibration, the Bicentennial meter measured a constant 145 barrels (give or take a barrel or two) more than the actual flow.

77.     Upon information and belief, Belle Fourche attempted to correct the improper zero calibration by applying a negative 16.2% "correction factor" (when it should have just done another zero calibration when there was no actual flow). The negative correction factor reduced the measured flow by 16.2% relative to the actual flow.

78.     The net effect of these two mistakes varied depending on the actual flow.

79.     Following these two mistakes, the flow measured by the Bicentennial meter equaled the actual flow (in barrels per hour) plus 145 barrels per hour (as a result of the improper zero calibration) minus 16.2% of the sum of the actual flow and 145 barrels per hour. So, for example, if the actual flow was 1,000 barrels per hour – the average actual flow on the Skunk Hill to Bicentennial Segment in the 30 days leading up to the Ash Coulee Spill – the Bicentennial meter would read approximately 960 barrels per hour (i.e. 1,000 bph + 145 bph – 0.162 x (1,000 bph + 145 bph)).

80.     The mistakes canceled each other out only when actual flow was 750 barrels per hour.

81.     When actual flow was less than 750 barrels per hour, the Bicentennial meter read more than actual flow.

82.     When actual flow was more than 750 barrels per hour, the Bicentennial meter read less than actual flow.

83.     By July 2016, Belle Fourche was aware that the Bicentennial meter was mis-calibrated, yet did nothing to correct it.

84.     The difference between the flow, as measured by the Bicentennial meter, and the actual flow at normal operating flows was minimal. As noted above, there was no difference when actual flow was 750 barrels per hour (at that flow the two mistakes cancelled each other out). When the actual flow was 1,000 barrels per hour, the average flow at the time of the Ash Coulee Spill according to Belle Fourche, the Bicentennial meter was under-measuring actual flow by about 40 barrels per hour (or approximately 4%).

85.     At the time of the Ash Coulee Spill, Belle Fourche knew, or should have known, the magnitude of the mis-calibration of the Bicentennial meter.

86.     While the difference between the actual flow and the flow measured by the Bicentennial meter varied based on the actual flow, as described above, the relative magnitude of the mis-calibration of the Bicentennial meter did not change in the weeks leading up to the Ash Coulee Spill.

87.     Accordingly, a significant increase in the discrepancy or short between the outgoing volume, as measured by the Skunk Hill meter, and the incoming volume, as measured by the Bicentennial meter, would be indicative of a leak.[1]

---

[1] Notably, the absence of an imbalance would not definitively indicate the absence of a leak on the Skunk Hill to Bicentennial Segment. At the time of the Ash Coulee Spill, in addition to oil from the Skunk Hill Station, oil was added from 11 third-party well-pads. The volume of oil added from these well-pads was not communicated to the control room via the SCADA system. Therefore, operators of the Skunk Hill to Bicentennial Segment could not know in real time how much, if any, oil was being added from the third-party well-pads at any given time. The lack of instrumentation meant that Defendant could not safely assess the volume of oil being transported in the Skunk Hill to Bicentennial Segment or determine if the segment was holding oil when it was shutdown with no flow.

**Failure to Immediately Shutdown Based on Flow Imbalance**

88.     When the Bicentennial Pipeline ruptured, on or about the evening of December 1, 2016, there was a sudden and significant increase in the magnitude of the discrepancy (or short) between the outgoing volume, as measured by the Skunk Hill meter, and the incoming volume, as measured by the Bicentennial meter.

89.     On or about the evening of December 1, 2016, Belle Fourche was aware of this sudden and increased discrepancy, or should have been.

90.     This sudden and significant increase in the discrepancy between the outgoing volume, as measured by the Skunk Hill meter, and the incoming volume, as measured by the Bicentennial meter was indicative of a pipeline leak – a condition that presented an immediate hazard to persons or property.

91.     At Belle Fourche, a "scheduler" is responsible for coordinating oil deliveries with customers and connecting pipelines. The scheduler receives daily information from Defendant's control room (referred to as the "Current DATE" report) about volumes shipped from and to various points along the pipelines. The scheduler puts this information into a spreadsheet that includes the Skunk Hill and Bicentennial stations, which allows the scheduler to spot differences in the incoming and outgoing volumes at these two locations.

92.     On December 3, 2016, the scheduler reviewed the Current DATE report and noticed that the discrepancy in the outgoing volume from the Skunk Hill station and the incoming volume to the Bicentennial station (the pipeline "short") was substantially greater than what he was used to seeing.

93.     That same day, December 3, 2016, the scheduler reported the increased pipeline short to the Belle Fourche control room.

94.     According to Belle Fourche, after the scheduler reported the increased pipeline short, a Belle Fourche controller reviewed recent pressure and flow data from the Skunk Hill station (called a "trend") and spoke with a field employee to find out whether there were any maintenance or other issues that may have accounted for the discrepancy.

95.     According to Belle Fourche, the controller and field employee erroneously concluded that the discrepancy was attributable to the mis-calibrated Bicentennial meter (and therefore not a leak).

96.     While the mis-calibrated Bicentennial meter would explain a modest pipeline short (when actual flows were more than 750 barrels per hour), it would not have reasonably explained the sudden and significant increase in the short, which should have been apparent to Belle Fourche's controllers on December 1, 2016 and which was actually observed by the scheduler and reported to the control room on December 3, 2016.

97.     Despite this plain sign of a significant leak, Belle Fourche controllers did nothing more than check the trend of pressure and flow from Skunk Hill and talk with a field employee.

98.     Dismissing the possibility of a leak, Belle Fourche continued to operate the Skunk Hill to Bicentennial Segment as usual for days, until the morning of December 5, 2016, when Belle Fourche received a call from a local rancher reporting the spill.

**Cause and Impact of Ash Coulee Spill**

99.     The Ash Coulee Spill was caused by mass movement (in common terms a landslide).

100.     The force of the mass movement caused the pipeline to rupture, discharging approximately 14,400 barrels of crude oil, including into an unnamed tributary to Ash Coulee Creek, Ash Coulee Creek itself, the Little Missouri River, and their adjoining shorelines.

101.    The Ash Coulee Spill caused a sheen on the unnamed tributary to Ash Coulee Creek, Ash Coulee Creek itself, and the Little Missouri River.

102.    The Ash Coulee Spill resulted in exceedances of State water quality standards for various pollutants in the unnamed tributary to Ash Coulee Creek, Ash Coulee Creek itself, and the Little Missouri River, including the benzene standard in the unnamed tributary to Ash Coulee Creek and Ash Coulee itself.

103.    The Ash Coulee Spill also resulted in the contamination of soil and groundwater at and near the Site.

104.    Belle Fourche has failed to complete remediation of the Ash Coulee Spill. As a result, crude oil continues to impact and contaminate surface water, groundwater, and soil at and near the Site.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**By the United States: Civil Penalties for Ash Coulee Spill**
**33 U.S.C. § 1321(b)**

105.    Paragraphs 1 through 104 are incorporated herein by reference.

106.    At all relevant times, Belle Fourche has been the owner, operator, or person in charge of the Bicentennial Pipeline.

107.    The Bicentennial Pipeline is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10).

108.    Beginning on or about December 1, 2016 and continuing until at least December 5, 2016, the Bicentennial Pipeline ruptured, spilling approximately 14,400 barrels of crude oil, including into an unnamed tributary to Ash Coulee Creek, Ash Coulee Creek itself, the Little Missouri River, and their adjoining shorelines.

109.    The unnamed tributary to Ash Coulee Creek, Ash Coulee Creek itself, and the Little Missouri River are "navigable waters" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

110.    The unnamed tributary to Ash Coulee Creek and Ash Coulee Creek are perennial, relatively permanent tributaries to the Little Missouri River.

111.    The Little Missouri River is an interstate water, a traditionally navigable water, and a relatively permanent tributary to the Missouri River.

112.    The spilled crude oil caused a sheen on the unnamed tributary to Ash Coulee Creek, Ash Coulee Creek, and the Little Missouri River and discoloration of the adjoining shoreline, and/or violated applicable water quality standards. Thus, the discharge was in a quantity that "may be harmful" within the meaning of Section 311(b)(3) and (4) of the CWA, 33 U.S.C. § 1321(b)(3) and (4); 40 C.F.R. § 110.3.

113.    Belle Fourche's discharge violated Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

114.    Accordingly, Belle Fourche is liable for civil penalties of up to $2,072 per barrel discharged pursuant to Section 311(b)(7)(A) of the CWA, or, if it is proven that the violation was the result of gross negligence or willful misconduct, $6,215 per barrel discharged under Section 311(b)(7)(D) of the CWA. See 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### By the United States: Injunctive Relief under CWA Section 309(b)
### 33 U.S.C. § 1319(b)

115.    Paragraphs 1 through 104 are incorporated herein by reference.

116.    The crude oil that was spilled in connection with the Ash Coulee Spill was a "pollutant," within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

117.     The discharge of crude oil in connection with the Ash Coulee Spill reached waters of the United States and constituted the "discharge of a pollutant," within the meaning of Sections 301(a) and 502(12) of the CWA, 33 U.S.C. §§ 1311(a), 1362(12).

118.     Belle Fourche was not authorized by any permit to discharge the crude oil associated with the Ash Coulee Spill to waters of the United States.

119.     The discharge of crude oil in connection with the Ash Coulee Spill violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

120.     Accordingly, Belle Fourche is liable for injunctive relief pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

**THIRD CAUSE OF ACTION**

**By the United States: Civil Penalties, Punitive Damages, and Injunctive Relief under the Federal Pipeline Safety Regulations**
**(Failure to Take Measures to Prevent and Mitigate the Consequences of a Failure of the Skunk Hill to Bicentennial Segment)**
**49 C.F.R. § 195.452**

121.     Paragraphs 1 through 104 are incorporated herein by reference.

122.     At all relevant times, Belle Fourche was an "operator" of the Skunk Hill to Bicentennial Segment within the meaning of 49 C.F.R. § 195.2.

123.     At all relevant times, the Skunk Hill to Bicentennial Segment transported "hazardous liquids" within the meaning of 49 C.F.R. § 195.2.

124.     At the time of the Ash Coulee Spill, the Skunk Hill to Bicentennial Segment could affect a HCA, within the meaning of 49 C.F.R. § 195.450.

125.     At the time of the Ash Coulee Spill, the Skunk Hill to Bicentennial Segment was included in the written Integrity Management Plan developed by Belle Fourche to comply with 49 C.F.R. § 195.452.

126.    As the operator of a hazardous liquid pipeline that could affect a HCA, Belle Fourche is subject to the requirements in 49 C.F.R. § 195.452 concerning pipeline integrity management.

127.    The section of the Bicentennial Pipeline that failed in connection with the Ash Coulee Spill ("failed section") is located in an area that is known for unstable soils, slope failures, and other mass movements.

128.    Belle Fourche was aware, prior to the Ash Coulee Spill, that the failed section was located in an area with unstable soils and prone to slope failure and other mass movement.

129.    Despite this knowledge, Belle Fourche failed to conduct a risk analysis specific to the Site that followed recognized industry practices and involved persons qualified to evaluate the results and information.

130.    Belle Fourche's attempt in 2013 to prevent a failure at the Site did not follow recognized industry practices, as required by 49 C.F.R. § 195.452(b)(6), because it did not gather site-specific geologic information, such as soil borings, and use that information to adequately address the known risks associated with landsides and other mass movements at the Site.

131.    As described herein, Belle Fourche failed to take measures to prevent and mitigate the consequences of a failure of the Bicentennial Pipeline from known geological risks, including slope failure and other mass movement, prior to the Ash Coulee Spill, in violation of 49 C.F.R. § 195.452(i).

132.    Pursuant to 49 U.S.C. § 60120(a)(1), Belle Fourche is liable for injunctive relief, punitive damages, and civil penalties for its violation of 49 C.F.R. § 195.452(i).

## FOURTH CAUSE OF ACTION

**By the United States: Civil Penalties, Punitive Damages, and Injunctive Relief under the Federal Pipeline Safety Regulations
(Failure to Correct Conditions That Could Adversely Affect Safe Operation)
49 C.F.R. § 195.401(b)(1)**

133.     Paragraphs 1 through 104 are incorporated herein by reference.

134.     The Bicentennial Pipeline was constructed with steel pipe.

135.     At the time of the Ash Coulee Spill, Belle Fourche relied on flow meters at the Skunk Hill and Bicentennial stations to detect leaks on the Skunk Hill to Bicentennial Segment.

136.     Given their importance in detecting leaks, properly calibrated flow meters at the Skunk Hill and Bicentennial stations were necessary for the safe operation of the Skunk Hill to Bicentennial Segment.

137.     From at least July 2016, Belle Fourche knew that the flow meter at the Bicentennial Station was mis-calibrated.

138.     As of December 1, 2016, Belle Fourche still had not corrected the calibration of the Bicentennial meter.

139.     Belle Fourche failed to correct the calibration of the flow meter at the Bicentennial Station within a reasonable time, in violation of  49 C.F.R. § 195.401(b)(1).

140.     Moreover, on or about December 1, 2016, when the Bicentennial Pipeline ruptured, Belle Fourche knew or should have known, based on data from the Skunk Hill and Bicentennial flow meters, that there had been a sudden and significant increase in the flow imbalance on the Skunk Hill to Bicentennial Segment, indicative of a significant leak.

141.     This condition (i.e. operating with a sudden and significant increase in the imbalance in flow from Skunk Hill to Bicentennial, indicative of a significant leak) presented an immediate hazard to persons or property.

142.    Despite this sudden and significant increase in the flow imbalance, Belle Fourche continued to operate the Skunk Hill to Bicentennial Segment as usual until December 5, 2016, in violation of 49 C.F.R. § 195.401(b)(1).

143.    Pursuant to 49 U.S.C. § 60120(a)(1), Belle Fourche is liable for injunctive relief, punitive damages, and civil penalties for each violation of 49 C.F.R. § 195.401(b)(1).

### FIFTH CAUSE OF ACTION

### By the State: Civil Penalties Under N.D. Cent. Code Chapter 61-28

144.    Paragraphs 1 through 104 are incorporated herein by reference.

145.    In addition to surface water, the Ash Coulee Spill also travelled subsurface beneath approximately 1.5 acres, contaminating Class I groundwater of the State. See N.D. Admin. Code § 33-16-02.1-10.

146.    The unnamed tributary, Ash Coulee Creek, the Little Missouri River, and the groundwater are all "waters of the state" within the meaning of N.D. Cent. Code § 61-28-02(15).

147.    The Ash Coulee Spill was a "discharge" within the meaning of N.D. Cent. Code § 61-28-02(3).

148.    The Bicentennial Pipeline is a "point source" within the meaning of N.D. Cent. Code § 61-28-02(6).

149.    Crude oil and benzene are "wastes" under N.D. Cent. Code § 61-28-02(14) that caused "pollution," within the meaning of N.D. Cent. Code § 61-28-02(7).

### Unpermitted Discharge

150.    Belle Fourche did not have a NDPDES permit to discharge wastes into waters of the state and had not filed a completed permit application at the time of the discharge, as required by N.D. Cent. Code § 61-28-06(2)-(3) and N.D. Admin. Code § 33-16-01-02.

151.    Belle Fourche's discharge into waters of the state without a NDPDES permit violated N.D. Cent. Code § 61-28-06(2)-(3) and N.D. Admin. Code § 33-16-01-02.

### Pollution and Degradation of Water Quality

152.    The unnamed tributary and Ash Coulee Creek are each designated as a Class III stream. The Little Missouri River is designated as a Class II stream. Appendix I, N.D. Admin. Code ch. 33-16-02.1.

153.    The groundwater around and under the spill site, the unnamed tributary, Ash Coulee Creek, and the Little Missouri River is a Class I groundwater of the State. N.D. Admin. Code § 33-16-02.1-10.

154.    The Ash Coulee Spill caused violations of the State's numeric standards for Class III streams in the unnamed tributary to Ash Coulee Creek and Ash Coulee Creek itself and for Class II streams in the Little Missouri River, see N.D. Admin. Code § 33-16-02.1-09 (2014), numerous times between December 7, 2016 and June 25, 2017.

155.    The Ash Coulee Spill caused the unnamed tributary's waters, Ash Coulee Creek's waters, the Little Missouri River's waters, and groundwater to violate the State's narrative standards in N.D. Admin. Code § 33-16-02.1-08. Specifically, the Ash Coulee Spill caused floating oil and scum in amounts that were "unsightly or deleterious"; contaminants from the Ash Coulee Spill were in concentrations and combinations "toxic or harmful" to humans, animals, plants, and resident aquatic biota"; the Ash Coulee Spill caused a visible film or sheen upon the unnamed tributary, Ash Coulee Creek, and the Little Missouri River and a sludge or emulsion along the adjoining shorelines; and the Ash Coulee Spill prevented the classified uses of the unnamed tributary, Ash Coulee Creek, the Little Missouri River, and the groundwater. In

addition, the Ash Coulee Spill caused an injury to environmental resources and impaired the beneficial uses of waters of the State.

156.    Belle Fourche's discharge of wastes into the unnamed tributary, Ash Coulee Creek, the Little Missouri River, and groundwater caused pollution of the State's waters and caused degradation of water quality below the State's numeric and narrative water quality standards in violation of N.D. Cent. Code § 61-28-06(1) and N.D. Admin. Code §§ 33-16-02.1-08, 33-16-02.1-09, and 33-16-02.1-11(2).

### Failure to Report

157.    Belle Fourche did not report the Ash Coulee Spill to NDDEQ until December 5, 2016, days after the Ash Coulee Spill first occurred.

158.    The report submitted to NDDEQ understated the volume and duration of the Ash Coulee Spill.

159.    Belle Fourche failed to "immediately" report the Ash Coulee Spill and, when they eventually did report it, failed to "provide all relevant information" in violation of N.D. Admin. Code § 33-16-02.1-11(4).

### Penalties

160.    As a result of Belle Fourche's violation of N.D. Cent. Code ch. 61-28 and the rules promulgated thereunder, Belle Fourche is liable under N.D. Cent. Code § 61-28-08(4) for a civil penalty up to $12,500 per day per violation.

### SIXTH CAUSE OF ACTION

### By the State: Civil Penalties Under N.D. Cent. Code Chapter 23-29

161.    Paragraphs 1 through 104 are incorporated herein by reference.

162.     Belle Fourche is responsible for the proper disposal of the crude oil that was spilled at and near the Site under N.D. Admin. Code § 33-20-01.1-04(1).

163.     Crude oil is a "solid waste" within the meaning of N.D. Cent. Code § 23-29-03(14).

164.     The Ash Coulee Spill resulted in the "disposal" of solid waste within the meaning of N.D. Cent. Code § 23-29-03(3).

165.     Because Belle Fourche has failed to complete remediation of the Ash Coulee Spill, solid waste remains in soil and groundwater at and near the Site.

### Unpermitted Disposal

166.     Belle Fourche did not and does not have a permit to dispose of solid waste at and near the Site, as required by N.D. Cent. Code § 23-29-07 and N.D. Admin. Code § 33-20-02.1-01.

167.     Belle Fourche disposed of solid waste at and near the Site in violation of N.D. Cent. Code § 23-29-07 and N.D. Admin. Code § 33-20-02.1-01.

### Abandonment of Solid Waste

168.     Belle Fourche has not removed a significant amount of the solid waste that it disposed of at and near the Site.

169.     Belle Fourche abandoned solid waste at and near the Site in violation of N.D. Admin. Code § 33-20-01.1-04(2).

### Penalties

170.     As a result of Belle Fourche's violation of N.D. Cent. Code ch. 23-29 and the rules promulgated thereunder, Belle Fourche is liable under N.D. Cent. Code § 23-29-12(1) for a civil penalty up to $12,500 per day per violation.

## SEVENTH CAUSE OF ACTION

### By the State: Injunctive Relief Under
### N.D. Cent. Code Chapters 61-28 and 23-29

171.     Paragraphs 1 through 104 are incorporated herein by reference.

172.     Violations of N.D. Cent. Code chs. 61-28 and 23-29, and the rules promulgated

thereunder, are likely to continue unless enjoined by an order of the Court.

173.     Belle Fourche is subject to appropriate injunctive relief pursuant to N.D. Cent.

Code §§ 61-28-08(5) and 23-29-11.

## EIGHTH CAUSE OF ACTION

### By the State: Cost Recovery Under
### N.D. Cent. Code Chapters 23-31 and 23.1-10

174.     Paragraphs 1 through 104 are incorporated herein by reference.

175.     At the time of the Ash Coulee Spill, N.D. Cent. Code § 23-31-01 was in effect

and allowed NDDEQ (then the North Dakota Department of Health) to "recover from the parties

responsible for an environmental emergency the reasonable and necessary state costs incurred in

assessment, removal, corrective action, or monitoring as a result of an environmental emergency

in violation of chapter [23-29 or 61-28]."

176.     The Ash Coulee Spill was an "environmental emergency" within the meaning of

N.D. Cent. Code § 23-31-01 because it was "a release into the environment of a substance

requiring an immediate response to protect public health or welfare or the environment from an

imminent and substantial endangerment" and was a violation of N.D. Cent. Code chs. 23-29 and

61-28.

177.     On December 9, 2016, NDDEQ sent Belle Fourche a letter notifying it that

NDDEQ had determined that the Ash Coulee Spill was an "environmental emergency" for which

NDDEQ would be seeking cost recovery for assessment and monitoring under N.D. Cent. Code § 23-31-01.

178.    NDDEQ's costs in responding to the Ash Coulee Spill were "reasonable and necessary" because they were incurred by NDDEQ due to Belle Fourche's failure to "implement appropriate assessment and corrective action after receipt of written notice" or were incurred by NDDEQ "prior to identification of the responsible parties."

179.    In addition, NDDEQ has incurred costs relating to the Ash Coulee Spill under N.D. Cent. Code § 23.1-10-12, which went into effect on July 1, 2021, but is retroactive in application (N.D. Sess. Laws, ch. 212, § 20). These include corrective action costs, as well as costs for administrative and legal expenses.

180.    To date, NDDEQ has incurred $98,839.04 in costs in responding to the Ash Coulee Spill, not including administrative and legal expenses.

181.    Pursuant to former N.D. Cent. Code ch. 23-31-01 (repealed in 2019 by 2017 N.D. Sess. Laws, ch. 199, § 74) and to N.D. Cent. Code ch. 23.1-10, Belle Fourche is liable to NDDEQ for its corrective action costs relating to the Ash Coulee Spill, and is liable to NDDEQ for its administrative and legal expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Assess a civil penalty against Belle Fourche in connection with the Ash Coulee Spill pursuant to Section 311(b) of the CWA, 33 U.S.C. § 1321(b), and Sections 61-28-08 and 23-29-12 of the North Dakota Century Code, in an amount to be determined by the Court;

2.      Order Belle Fourche to take all necessary steps to prevent future discharges of oil

into navigable waters and remediate the Ash Coulee Spill pursuant to Section 309(b) of the

CWA, 33 U.S.C. § 1319(b), and N.D. Cent. Code §§ 61-28-08(5) and 23-29-04(8);

3.      Assess a civil penalty and/or punitive damages pursuant to the PSA, 49 U.S.C. §

60120(a)(1), against Belle Fourche for each violation of the applicable provisions of the PSA and

the Federal Pipeline Safety Regulations;

4.      Order Belle Fourche to reimburse NDDEQ for its costs incurred in responding to

the Ash Coulee Spill, including its administrative and legal expenses.

5.      Award other injunctive relief against Belle Fourche as appropriate, including

remediation of the Ash Coulee Spill; and

6.      Grant such other relief as the Court deems just and proper.


Respectfully Submitted,


TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice


/s/ Mark C. Elmer
MARK C. ELMER
United States Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1352
Fax: (303) 844-1350
Email: Mark.Elmer@usdoj.gov

OF COUNSEL:

MARGARET J. ("PEGGY") LIVINGSTON
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado 80202

ERIN HENDRIXSON
JOSEPH HAINLINE
Attorney-Advisors
Office of Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Ave. S.E.
Washington, DC 20590

*Attorneys for the United States of America*


FOR THE STATE OF NORTH DAKOTA,
NORTH DAKOTA DEPARTMENT OF
ENVIRONMENTAL QUALITY


DREW H. WRIGLEY
North Dakota Attorney General


/s/ Margaret I. Olson
MARGARET I. OLSON
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, North Dakota 58501-4509
Telephone: (701) 328-3640
Fax: (701) 328-4300
Email: maiolson@nd.gov

*Attorneys for the State of North Dakota*